## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **CAROL J. GODDARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:14-cv-1758-WTL-DML** |
| **vs.** | ) | |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| *Commissioner of the* | ) | |
| *Social Security Administration,* | ) | |
| | ) | |
| **Defendant.** | ) | |

### *PLAINTIFF'S BRIEF IN SUPPORT OF COMPLAINT FOR JUDICIAL REVIEW*

### I. STATEMENT OF THE CASE

Plaintiff, Carol J. Goddard, (hereinafter also referred to as "plaintiff" or "claimant") seeks judicial review of the Commissioner of the Social Security Administration's (hereinafter "SSA" or "the Agency") final decision denying the plaintiff's applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act filed pursuant to 42 U.S.C. § 423 and for Supplemental Security Income Benefits ("SSI") under Title XVI of the Social Security Act filed pursuant to 42 U.S.C § 1382c(a)(3).

In her DIB and SSI applications (R. at 197, 204), which the plaintiff protectively filed on July 13, 2011 (R. at 233), the Plaintiff alleges an onset of disability date of May 13, 2011 (R. 197, 204).  In her initial adult disability report, the plaintiff alleged disability due to fibromyalgia, chronic fatigue, IBS, depression, hands, transient ischemic attack (gray matter abnormality), chronic fatigue, fibromyalgia with constant pain, IBS (diarrhea alternating with constipation), blurred vision and glaucoma in her eyes, arthritis in her hands (especially in thumbs), depression, tension headaches, memory loss, and osteopenia (R. at 236).  By the time of the hearing, in addition to the impairments alleged in her  adult disability

report, the claimant also alleged abdominal cramping, anxiety disorder, back and neck pain (lumbarization of S1 and moderate degenerative changes of C6), changes in the subcortical white matter of the brain, major depressive disorder- moderate, recurrent, a childhood history of epilepsy, hand tenderness bilaterally, Thumb CMC joint pain and osteoarthritis, numbness and tingling of the hands, wrists pain (treatment included splinting of the wrist), hand tremors, migraine headaches, hearing deficit, ventral hernia, leukocytosis, lymphocytic colitis, sleep apnea, osteoporosis (including the lumbar spine), plantar fasciitis (R. at 307).

A hearing was held in Indianapolis, Indiana on October 12, 2012 the Honorable Monica LaPolt, Administrative Law Judge ("ALJ") (R. at 71) where the plaintiff was present in person and with her attorney, Jennifer M. Hess. (R. at 71). Following the hearing, Vocational Interrogatories were submitted to Ms. Tanya Owen, a vocational expert residing in Fayetteville, Arkansas (R. at 333).   Here responses to written interrogatories were proffered via a letter of January 17, 2013 (R. 351).  The claimant, by her attorney, requested a supplemental hearing (R. at 354).  A supplemental hearing was held on May 20, 2013, again before the Honorable Monica LaPolt at which time the plaintiff appeared in person and with her attorney, Jennifer M. Hess and Ms. Gail Franklin, a vocational expert also appeared (R. 32).  On May 20, 2013, the ALJ issued an unfavorable decision in which she found that the claimant had the Residual Functional Capacity[1] ("RFC") to perform light work with some postural restrictions; "After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally stoop, crouch, crawl, and climb ramps or stairs; and never climb ladders, ropes, or scaffolds." (R. at 21).   The ALJ found that the claimant has past relevant work as a customer service clerk, photograph printer, laboratory chief, receptionist, inventory clerk, and cashier/checker and that she had the ability to perform these past relevant jobs (R. 24).

---

[1] "Residual functional capacity" or "RFC" denotes what an individual can still do, despite his or her

2

The Plaintiff filed a request for review to the Appeals Council on August 23, 2013 (R. 10).   On August 27, 2014, the Appeals Council denied Plaintiff's request for review (R. 1), thereby rendering the ALJ's decision the final decision of the Agency. (*See* 20 C.F.R. §§ 404.981, 416.1481[2]).   The Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) for review of the agency's decision.

## II.
## STATEMENT OF FACTS

The claimant was born on December 6, 1951 (R at 204).   She has the equivalent of a high school education having completed her GED (R. at 37) at age 42 (R at 74).   She states that she is 5'2 tall and weighs 155lbs (R. at 75).   She last worked as a cashier at Kroger (R. at 75) after having lost her job in the Kroger front office due memory issues; "that's how I lost my position in the front office, because I was making mistake.   I was throwing the balances off by forgetting to do things" (R. 82).   The plaintiff indicates that the last day that she worked was May 13, 2011 when she experienced at TIA was (R. 78).   Dr. Kobza, a neurologist with JWM Neurology, describes what  occurred on May 13, 2011;

> "Ms. Goddard states that on May 13, 2011 she noticed that she had some increased floaters over what she normally has in her eyes, especially on the right. She suddenly felt dizzy and had a burst of a kaleidoscope type effect of light .... she felt emotional and tearful and ever since then has been more depressed with her chronic fibromyalgia-type complaint. She does have a family history of aneurysms both in her father, cousin, uncle, and an aunt and migraines in a sister and a niece. She just wanted to make sure nothing was wrong. She had an MRI done by her primary care physician, which is reported as borderline abnormal referred for evaluation. . . .I will see Ms. Goddard back after after the CT angiogram" (Tr. 373-375)

The claimant was approved for FMLA medical leave from May 16, 2011 to June 15, 2011 and then from June 16, 2011 to August 18, 2011 (R. at 302).   The claimant was 59 years old as of her alleged onset date of disability of May 13, 2011, making her a person of "advanced age" pursuant to 20 C.F.R. § 404.1563(e) as of the alleged onset date of disability and closely approaching retirement age (age 60 and

---

limitations. 20 C.F.R. § 404.1545(a).

over) for the majority of the claim pursuant to 20 CFR § 404.1568(d)(4) which is relevant to transferability of skills.[3]

The claimant reports past work as a photo lab manager, a receptionist, and as a cashier and customer service clerk at Kroger (R. at 303).

The claimant reasserts the discussion of her work history, impairments, and discussion of impairments and residual functional capacity contained at R. 306-325.

### III. STANDARD OF REVIEW

#### A.  Standard for Disability

The standard for disability is best articulated by a reference to *Weatherbee v. Astrue;*

> "Disability is determined under a five-step sequential analysis. *Weatherbee v. Astrue,* 649 F.3d 565, 568–69 (7th Cir.2011) (citing *Craft v. Astrue,* 539 F.3d 668, 673 (7th Cir.2008)): The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, [she] is not disabled. The fifth step assesses the applicant's RFC, as well as [her] age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, [she] is not disabled. *Hunt v. Astrue*, 12-C-46, 2012 WL 3779193 (E.D. Wis. Aug. 31, 2012)

#### B. Standard of Review

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*. The SSI regulations are substantially identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*. For convenience, only the DIB regulations will be cited henceforth in this memorandum.

[3] 20 CFR § 404.1568(d)(4) *Transferability of skills for persons of advanced age*. . . . If you are *closely approaching retirement age* (age 60 or older) and you have a severe impairment(s) that limits you to no more than *light* work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry. (See § 404.1567(b) and Rule 202.00(f) of appendix 2 to this subpart.)

According to 42 U.S.C §405(g), "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  Further, substantial evidence has been defined in the Seventh Circuit as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir. 1996) ·citing *Edwards v. Sullivan,* 985 F.2d 334, 336 (7th Cir.1993) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)).  The court will only reverse the Commissioner's findings if they are not supported by substantial evidence or if the Commissioner applied an erroneous legal standard. *Rohan v. Chater,* 98 F.3d 966, 970 (7th Cir.1996).  The Administrative Law Judge is required to build a "logical bridge" between the evidence and her decision. *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996).  Additionally, according to 20 CFR § 404.1527(d)(2), the Administrative Law Judge is required to give more weight to the opinion of treating sources than non-treating sources so long as the treating sources opinion is not inconsistent with other substantial evidence in the case record.  If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997).

## IV. ARGUMENT

### I.  THE ALJ ERRED AT STEPS 2 BY FAILING TO MENTION A NUMBER OF MEDICALLY DETERMINABLE IMPAIRMENTS AND AT STEP 4 OF THE SEQUENTIAL EVALUATION PROCESS BY FAILING TO CONSIDER THE RESTRICTIONS THAT THESE IMPAIRMENTS CAUSE IN HER RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT.

The Social Security Administration defines a medically determinable impairment as:

> "A "medically determinable" physical or mental impairment is an impairment that results from anatomical, physiological, or psychological abnormalities, which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of symptoms, signs, and laboratory findings - not only by the individual's statement of symptoms."  (See Social Security Handbook § 506).

5

The Social Security Administration defines symptoms, signs, and laboratory findings under 20 C.F.R. § 404.1528 as follows:

> (a) *Symptoms* are your own description of your physical or mental impairment. Your statements alone are not enough to establish that there is a physical or mental impairment.
>
> (b) *Signs* are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
>
> (c) *Laboratory findings* are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests.

The ALJ finds that the claimant has severe impairments consisting of fibromyalgia and osteoarthritis (R. 17).  She also finds that the claimant has not severe impairments consisting of "osteopenia, headaches, hernia repair, irritable bowel syndrome, glaucoma, situational depression, and anxiety."

The ALJ failed to mention the medically determinable impairments alleged by the claimant including memory loss, back pain, sleep apnea, plantar fasciitis, osteoarthritis in the hands and hand tenderness, wrist pain, lymphocytic colitis, and fatigue.  Memory loss is alleged throughout the records, including R. 270. The ALJ seems to believe that the claimant playing memory games is a sign that her memory loss is not an impairment, but the claimant indicates in her testimony, "I also play memory games to try to help me keep my memory up where it used to be" (R. 79). Her memory loss is documented at 390-398, Test Results of the WMS-IV (measuring memory abilities) were as follows: auditory memory: average, visual memory: average, visual working memory: low average (21st percentile rank), immediate memory: average, delayed memory: low average (18th percentile rank).   The VWMI (visual working memory Index) is a measure of ability to temporarily hold and manipulate spatial

6

locations and visual details).   The DMI (delayed memory index) is a measure of the ability to recall verbal and visual information after a 20 to 30 minute delay (R. 391-392) These tests were administered by Dr. Bryan London, EdD, Psychologist, HSPP (R. at 398) of the Indiana Department of Family & Social Services Disability Determination Bureau (R. 390) who believed the claimant to give her best effort and that the results were a good estimate of her current functioning (R. 391). Memory problems and difficulty with concentration are noted by Dr. McLaren at R. 645.   Dr. Frank notes issues with memory, fatigue, lightheadedness and headaches at R. 564. Changes in the plaintiff's subcortical white matter are seen on MRI at R. 383, noting, "Scattered areas of nonspecific abnormal signal are present in the subcortical white matter. Common etiologies include small vessel ischemic change, migraine, and demyelinating disease (R. 383).   The plaintiff contends that her memory problems would limit her to work that is simple and repetitive in nature with an SVP of 1 or 2.   This would eliminate work as a laboratory chief (SVP of 8), customer service clerk (SVP of 4), inventory clerk (SVP of 5), receptionist (SVP of 4) and cashier (SVP of 3) (see "*Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles*" (1993) published by the U.S. Department of Labor (hereinafter "SCO").

Back pain is discussed at R. 535 whereby Dr. McLaren notes that the plaintiff suffers from Lower Back Pain. Decreased Range of Motion.   Tender over left buttock and L SI joint (R. 535) three days of upper right sided upper back pain is associated with spasms that are moderate to severe and that the plaintiff is not sleeping well.   Dr. McLaren notes that he observed moderate severity of pain (R. 426). Dr. Mark Jones notes x-ray findings of X-ray findings indicate lumbarization of S1, posterior disc based mildly narrowed and moderate degenerative changes at C6, and reversal of the cervical lordosis (R. 656-658).   This would cause further limitations to the claimant's ability to sit and stand for extended periods of time and may require a sit-stand option.   Further, it may cause further postural limitations that those contained in in the opinion of the ALJ.

Sleep apnea is documented at 611-634.  The diagnosis of sleep apnea can be found at R. 606 following a polysomnography.  The ALJ fails to explain what impacts the claimant's fatigue would have on her ability stand for up to 6 hours in an eight hour workday (which plaintiff contends would be diminished) and the impact on her concentration and cognitive abilities due to lack of restful sleep.

Plantar fasciitis is diagnosed at 436-437 and a referral for injections is discussed. This would further limit the claimant's ability to stand and walk during the workday.

Difficulties with the claimant's hands are documented at by Dr. Kaiser noting Motor and sensory abnormalities noted.  "Tingling finger tips- all five.  Wakes up numb aches up the arm"  A/P: Nerve tingling.  She is to try CTS Splints. (R. 495-496).  Dr. McLaren notes that left-hand thumb area painful at the CMC joint, worse when picking things up.  No specific injury. No other joints involved.  Sharp and moderate.  On examination mild edema and tenderness of CMC joint.  Range of motion and strength are noted to be abnormal (R. 522-523).   At R. 520-521, Dr. McLaren notes that the plaintiff has suffered left hand pain for more than a year and left thumb pain for approximately one year.  Worsening- mild and constant was occasionally sharper and more severe tics.  Associate with weakness.  With respect to the left thumb- (illegible) CMC tend- strength 4/5 for opposition o/w 5/5.  In A/P is noted that osteoarthritis is suspected.  (R. 520-521).   The claimant then undergoes an x-ray of the left wrist (R. 524) whereby this is confirmed, "there is, however, some arthritic change involving the thumb carpometacarpal joint.  Some benign cyst changes are seen within the scaphoid."  Dr. Frank notes "Active problems include Glaucoma (365.9) and osteoarthritis of multiple sites (715.89) L thumb base and bilateral knees." (R. 564).  Dr. Jones notes hand difficulties as well, noting, ""All pain is localized except occasional right arm numbness which is located on the outer portion of the upper arm.  She says she has numbness and tingling in her fingertips related to the increase of physical activity. Carol says that her mid back, lower back and neck has been hurting for years. Carol says she has had spells of dizziness for the past year." (R. 659) Dr. McLaren notes "F\u fibromyalgia.   Doing worse this winter.  Also having increased OA

8

(Osteoarthritis) esp in hands + feet."  (R. 432-433).  At the consulting psychological exam, the claimant notes occasional hand tremors (R. 390).    During the consulting medical examination, the consulting examiner notes, "arthritis in hands: claimant alleges that she start to experience symptoms of this condition 15 years ago. She started to experience pain in both hands in the thumbs and wrists. This is progressed to include more fingers.  She takes naproxen and Tylenol with codeine for this condition." (R. 400) and notes on musculoskeletal examination, "The claimant exhibits 18/18 fibromyalgia tender points. She also had tenderness over all of the hand joints bilaterally."(R. 402).  Dr. McLaren notes including wrist pain (R. 445) and recommends splinting of the right wrist (R. 446).  The ALJ does not give the claimant any limitations based on her osteoarthritis, joint tenderness, tingling, and strength deficient of the hands including having to wear a splint on the right wrist; in fact, the ALJ does not even address the claimant's complaints of limitations of the hands given these conditions.  All of the jobs listed by the vocational expert require frequent reaching, handling, and fingering (SCO at p. 273, 111, 366, and 342) with the exception that the reception job requires frequent reaching and handling, but occasional feeling (SCO at p. 336). The cashier job requires constant reaching, handling, and feeling (SCO at 333). (It should be noted the ALJ cites DOT code 211.402-014 (R. at 25), however, no such DOT code exists. The DOT code for Cashier-Checker is 211.462-014.  The plaintiff can only assume that this with the correct job to which the ALJ was referring).  If the claimant was limited to only occasional reaching or occasional handling, she would not be capable of performing any of her past relevant work.  The ALJ failed to consider the implications of the claimant's hand problems and thus her decision is not supported by the record as a whole.  A reviewing court will not uphold an administrative decision that "fails to mention highly pertinent evidence." *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). Further, an ALJ "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). See also *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001) (stating that an ALJ must provide at least minimal analysis of the evidence "to permit an

informed review").

Hearing deficient at noted at R. 374 and R. 522-523 where the claimant is referred to audiology by Dr. McClaren for further testing.  As all claimant's past relevant work requires frequent hearing, except the inventory clerk which requires occasional hearings (SCO at p. 273, 111, 366, 342, 336, 333).

Clearly the clamant suffers from medically determinable impairments which are established by documented signs, symptoms, and laboratory findings in addition to those mentioned as severe and nonsevere impairments.   As the ALJ fails to mention or discuss these impairments, her decision is not supported by the record as a whole.  When the ALJ fails to mention relevant impairments, the ALJ could not have considered the combined impact of those impairments which is required; in assessing RFC, "an ALJ must consider the combined effects of all of the claimant's impairments, even those that would not be considered severe in isolation." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). See *Martinez v. Astrue*, 630 F.3d 693, 698 (7th Cir. 2011) ("Even if each problem assessed separately were less serious than the evidence indicates, the combination of them might well be totally disabling.").  Even where an ALJ states that she has considered the entire "combination of impairments, " *Arnett v. Astrue*, 676 F.3d 586, 590 (7th Cir. 2012), a reviewing court may still remand because the ALJ fails to mention relevant evidence or consider the combined impact of all impairments taken together, id. at 591-94.  The ALJ is not permitted to simply ignore the evidence which does note support her conclusion, to wit;

> "It is worth repeating that "an ALJ may not ignore an entire line of evidence that is contrary to her findings," *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999), rather she must "articulate at some minimal level [her] analysis of the evidence" to permit an informed review. *Clifford*, 227 F.3d at 872. Here (as noted above), the ALJ mentions only the medical evidence favoring the denial of benefits. And from her analysis, we are unable to discern whether she considered the record as a whole. Indeed, she made no mention of Zurawski's MRI results, and several of the medical findings that she relied on concerning Zurawski's capacity to work, including that of Dr. Semba, Dr. Spencer, and Dr. Deskin, were rendered before the MRI was ever taken. Although the ALJ also supported her decision with findings by ERGOS and Dr. Ghaly, she made no attempt to explain why the other evidence in the record, which appears to favor Zurawski (e.g., the MRI results), was overcome by the evidence on which she relied. For instance, the ALJ mentioned only Dr. Ghaly's November 14, 1996 report, which does not address (or, for that matter, rebut in a substantial way) the objective medical evidence favoring

Zurawski's claim. While we have never required an ALJ to address every piece of evidence or testimony in the record, the ALJ's analysis must provide some glimpse into the reasoning behind her decision to deny benefits. In this case, the ALJ's decision simply fails to permit an informed review, and therefore, a remand for a redetermination of Zurawski's residual functional capacity is necessary." *Zurawski v Halter*, 245 F.3d 881, 888-889 (7th Cir. 2001)

Given the foregoing, a remand is required.

## II. THE ALJ ERRED AT STEP 4 OF THE SEQUENTIAL EVALUATION PROCESS BY FAILING TO CONSIDER THE CLAIMANT'S NON-SEVERE IMPAIRMENTS IN HER RFC

The ALJ failed to consider the limitations imposed by impairments she found to be non-severe impairment in her RFC.  The ALJ's only mention of the claimant's IBS, Headaches, osteopenia, and vision issues are that "the claimant irritable bowel, headaches, osteopenia, and vision issues have been discussed above." (R. at 21).  One must hypothesize that the above discussion is the ALJ's evaluation under Step 2[4] of the sequential evaluation process where she appears to dismisses these non-severe impairments for due to lack of ongoing extensive treatment, indicating, with respect to her osteopenia which the ALJ found cause her "generalize pain and weakness,"  "treatment records show she does not receive ongoing treatment for this condition." (R. at 18).  With respect to her chronic migraines which occur once every two weeks and blurred vision, "she has not required aggressive treatment for headaches."(R. at 18), and with respect to her IBS, "the claimant said her irritable bowel causes frequent trips to the restroom. She said she becomes anxious secondary to irritable bowel," but marginalizes this condition indicating "currently, she takes over-the-counter agents for her symptoms." (R. at 18). Furthermore, the ALJ fails to provide any discussion as to the limiting effects of the claimant's anxiety and depression which she also finds to be non-severe (R. 17).  While the ALJ finds mild limitations with concentration, persistence, or pace (R. at 19), she fails to provide for any limitations for the claimant's mental health conditions, in fact, the only discussion of the claimant's mental health with respect the

residual functional capacity is noted at R. 24, which indicates "I give little weight to the consultative psychological examiners opinion the claimant was functioning with moderate symptomology because it is inconsistent with his own clinical findings in the claimant's lack of mental health treatment."   (R. at 24).   The errors in the credibility determination are discussed below, however, the ALJ's failure to provide any discussion as the to the limitation imposed by non-severe impairments is error and requires a remand;

> "When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." Id. § 404.1545(a)(2), (b), (c). Mental limitations must be part of the RFC assessment, because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." Id. § 404.1545(c)." *Craft v. Astrue,* 539 F.3d 668, 676 (7th Cir. 2008)

Further, the ALJ is obligated to consider all impairments in the aggregate;

> "The gravest error in an opinion with a number of contenders for that distinction is the failure to consider the bearing of Rider's extreme obesity. The administrative law judge mentioned in passing that it is a severe impairment but did not consider its significance in relation to Rider's knee. It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40. We repeat our earlier reminder that an applicant's disabilities must be considered in the aggregate."
>
> Enough said."  *Martinez v. Astrue*, 630 F.3d 693, 698-699 (7th Cir. 2011)

The ALJ fails to do either, and for this reason, the case must be remanded.

### III.  THE ALJ FAILS IN STEP 3 OF THE SEQUENTIAL EVALUATION PROCESS TO ARTICULATE WHY THE CLAIMANT DID NOT MEET A LISTING

The ALJ indicates "fibromyalgia and osteoarthritis" to be a severe impairment (R. at 17) but provides virtually no further discussion of these impairments or their specific limitation either at page 17 of the record or on pages 21-24 when discussing the claimant's RFC.  Further, she fails to even discuss

---

[4] All reference to "Steps" refer to the five-step sequential evaluation process required under 20 CFR § 404.1520(a)(4).

what part or parts of the body she finds to be impacted by osteoarthritis.  She only indicates that he claimant does not meet a listing, indicating;

> "I have specifically considered whether the claimant's physical impairments meet or medically equal the criteria of Listing 1.02 for major dysfunction of a joint. This listing is not met because there is no supporting evidence of gross anatomical deformity and chronic joint pain and stiffness with signs of limitation of motion resulting in inability to ambulate effectively or resulting in inability to perform fine and gross movements effectively in accordance with the listing." (R. 20).

The ALJ's failure to articulate any reason as to why she found osteoarthritis and fibromyalgia to be severe impairments and only discusses non-severe impairments (R. 17-20).  "We have repeatedly stated, however, that an ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability. . . failure to do so constitutes error." *Clifford v Apfel,* 227 F.3d 863, 870 (7th Cir. 2000).   As we cannot tell from the ALJ's decision whether the osterarthrits discussed is in the hands, back, knees, thumbs, feet, or elsewhere, the decision must be remanded. Again in her discussion of the claimant's RFC, it is impossible to tell where the ALJ found there to be osteoartitis and what restrictions she found to be warranted due to the plaintiff's osteoarthritis, (R. 21-24).  "While the ALJ is not required to address every piece of evidence, he must articulate some legitimate reason for his decision. See id. at 333. Most importantly, he must build an accurate and logical bridge from the evidence to his conclusion." *Green v. Apfel,* 204 F.3d 780, 781 (7th Cir. 2000); *Groves v. Apfel,* 148 F.3d 809, 811 (7th Cir. 1998). *Clifford v Apfel,* 227 F.3d 863, 872 (7th Cir. 2000).  The ALJ fails to build this logical bridge and thus the matter should be remanded.

## IV. THE ALJ'S CREDIBILITY DETERMINATIONS AS TO MEDICAL AND CONSULTING SOURCES ARE CONFLICTING AND NOT SUPPORTED BY THE RECORD

With respect to the credibility determinations given to consultative sources, the ALJ indicates, "I give little weight to the consultative psychological examiners opinion the claimant was functioning with moderate symptomology because it is inconsistent with his own clinical findings in the claimant's lack of

mental health treatment." (R. at 24). The ALJ fails to indicate which of Dr. London's clinical findings are in conflict. Further, she fails to cite any medical evidence which contradicts Dr. London's opinion, and instead cannot resist the temptation to play doctor and substitute her judgment for that of the physicians of record;

> "An ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record. *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).
>
> In this case, the testimony of Dr. Wallack and the two non-treating physicians did not support the reasons stated by the ALJ for finding that the pseudoseizures did not equal a listed impairment. First, the ALJ did not explain the relevance of the lack of EEG evidence for his finding that the pseudoseizures were not severe enough to equal a listing. The ALJ did not cite any evidence to contradict Dr. Stump's opinion that a negative EEG: (1) was perfectly consistent with Boiles's type of seizure disorder and (2) did not mean that her seizures were any less "real" than those that could be measured by electric output; thus, it was improper for the ALJ to use the lack of EEG evidence as support for his decision.
>
> The ALJ also improperly relied on the lack of emergency room visits as evidence that Boiles's seizures were not frequent enough to be equal in severity to impairments described in Listing 11.02. Again, the ALJ did not point to anything in the record that contradicted Dr. Stump's testimony that hospitalization was futile for someone suffering from pseudoseizures, which are essentially untreatable." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005)

Much likes the *Boiles* case, the ALJ wrongly discredits the consulting psychologist opinion indicating "she has not participated in outpatient counseling or other psychiatric services. She has never required psychiatric hospitalization." (R. 18). Not only is the ALJ wrong as the Dr. London reports that the claimant reported mental health services in 1992 where she attended Gallahue Adult Day Therapy Program on a daily basis for four to six weeks (R. at 394), she has other symptomology that is significant such as Dr. London's notation that "The claimant reports she has had suicidal thinking - most recently three weeks ago. She reports at the age of 16 she made a suicide attempt. She attempted to overdose on sleeping pills." (R. 393). Dr. London diagnoses the claimant as having Major Depressive Disorder, recurrent, moderate severity 296.32 and Anxiety Disorder –NOS 300.00. (R. 398). The claimant is found to have a GAF of 55 (R. 398). The ALJ mentions that she is not obligated to accept a GAF score , but

14

fails to provide any discussion as to the diagnosis of major depressive disorder or anxiety disorder (R. at 24).

The ALJ's statement that "I give little weight to the consultative psychological examiners opinion the claimant was functioning with moderate symptomology because it is inconsistent with his own clinical findings" is without merit or explanation.   The ALJ fails to articulate why this was "inconsistent' with his own clinical findings and fails to meet the minimum standard of articulation; the ALJ is required to "articulate at some minimal level [her] analysis of the evidence" to permit an informed review. *Clifford*, 227 F.3d at 872.

Furthermore in the prior paragraph, the ALJ touts how State medical consultants are experts and should be given great weight because they are ***"experts" even when they have not had the benefit of review of the entire record and have failed to render an opinion***, to wit;

> As for the opinion evidence, I have given great weight to the State agency medical consultant's opinion because their findings of fact regarding the nature and severity of the claimant's impairments are deemed expert opinion evidence from a non-examining source (SSR 96-6p ). While they did not have the benefit of reviewing a complete record, they adequately considered the claimant's symptoms and limited the claimant to light work, which is consistent with the finding in this decision.
>
> The consultative medical examiner did not offer an opinion; however, his findings are not inconsistent with this decision, therefore I have afforded weight to his opinion, but take into consideration they are a non-treating source. Counsel argued that the examiner did not have the benefit of reviewing medical records, and therefore, his findings would waiver. However, as a medical doctor and consulting physician, he recorded the objective findings present to his comprehensive physical examination, which in fact, is generally consistent with treatment notes from her family physician showing tenderness and malaise. (R. at 24)

It should be noted that the consultative examiner at R. 403, the consultative examiner notes that he does not have medical records for the conditions alleged, repeatedly stating;  "I have no medical records related to this condition" (R. 403) Thus the consultative examiners inability to substantiate osteoarthritis in the hands or glaucoma is not surprising as he did not have the x-ray results or eye test results.  This

should not be held against the claimant!  If the ALJ affords weight to the opinion of the consultative medical examiner, then she should also mention his statement that "Her function is limited by extreme fatigue and diffuse pain" (R. at 403) and "The claimant exhibits 18/18 fibromyalgia tender points. She also had tenderness over all of the hand joints bilaterally." (R. 402).  While this opinion does not provide specific functional limitations, the findings cannot be ignored by the ALJ especially in light of the ALJ's decision to give this opinion weight (R. at 24); just because the ALJ does not agree with consulting examiner does not mean the she can ignore the findings  and incorporate them into her RFC;  "An ALJ may not ignore an entire line of evidence that is contrary to her findings," *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

## V. THE ALJ'S CREDIBILTY DETERMINATIONS AS TO THE CLAIMANT ARE IMPROPER AND CONTARY TO THE RECORD .

The ALJ appears to fault the claimant for continuing to work when her symptoms first manifested, indicating;

> The claimant testified that despite medical management of symptoms, she continues to have chronic pain and fatigue. However, a detailed earnings record shows the claimant worked at SGA for several years with "chronic pain and fatigue" (Ex. 6D). For example, in January 2011, the claimant indicated her fibromyalgia and pain in her bilateral wrist and feet was worse; however, she was continuing to work SGA. Even then, clinical examination was not significant for neurological deficits or extreme fatigue." (R. 22)

First, plaintiff's attorney is unaware of any "clinical examination" that can determine extreme fatigue., thus the finding that the clinical examination for extreme fatigue was not significant is not surprising. Secondly, because a claimant attempts to work with symptoms does not preclude a finding that the symptoms because worse or other symptoms in aggregate forced the claimant to stop working.  The ALJ appears to penalize the claimant or hold a prejudice against her for working while in pain alluding to her being a malinger for indicating "chronic pain and fatigue" while working.   Further a finding of a full range of motion with fibromyalgia as allegedly found by Dr. McLaren at 9F (R. 22) is not unusual or

dispositive of fibromyalgia in which a patient is generally limited by pain with motion and not a loss of range of motion.  Again the claimant is discredited at R. 22 for having a full range of motion, to wit; "Dr. Small indicated the claimant had 18/18 tender points and tenderness over all of the hand joints bilaterally. Regardless, he found full range of motion in the spine and all upper and lower extremities." (R. 22) The ALJ finds the claimant's allegation of her limitations to not be credible noting, "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." (R. 23)

The ALJ appears to disregard the claimant's pain which is contrary to caselaw given the findings of fibromyalgia; to wit;

> "Applicants for social security benefits who claim to be disabled from working because of extreme pain make the job of a social security administrative law judge a difficult one. Medical science confirms that pain can be severe and disabling even in the absence of "objective" medical findings, that is, test results that demonstrate a physical condition that normally causes pain of the severity claimed by the applicant. E.g., Dennis C. Turk & Akiko Okifuji, "Assessment of Patients' Reporting of Pain: An Integrated Perspective," 353 Lancet 1784 (1999); Paula M. Trief et al., " Functional vs. Organic Pain: A Meaningful Distinction?" 43 J. Clinical Psych. 219 (1987). And so "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability. Indeed, in certain situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (per curiam) (citations omitted). "Pain, fatigue, and other subjective, nonverifiable complaints are in some cases the only symptoms of a serious medical condition. To insist in such a case, as the social security disability law does not ... that the subjective complaint, even if believed by the trier of fact, is insufficient to warrant an award of benefits would place a whole class of disabled people outside the protection of that law." *Cooper v. Casey*, 97 F.3d 914, 917 (7th Cir. 1996) (citations omitted); see 20 C.F.R. § 404.1529(b)(2)." *Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004)

The ALJ indicates "As for treatment, other than the use of medication to alleviate pain, the

claimant has not tried physical therapy, steroid injections, or pain management. She has been encouraged to exercise and use wrist splints as needed. She does not engage in alternative treatment modalities such as acupuncture, hot/cold therapy, or chiropractic care." (R. 23). This is simply untrue. The claimant's chiropractic records can be found at R. at 654-662. Furthermore, the claimant explains that lack of treatment and prescriptions is due to the plaintiff's lack of medical insurance and inability to afford treatment which she points out at R. at 68, 80, 88, & 284. The ALJ fails to mention this in her decision and goes on to discredit the claimant which is contrary to caselaw which indicates that the ALJ is not permitted to draws negative inference from this lack of treatment;

> "Shauger principally argues that the ALJ could not discredit his testimony based on a perception of unexplained gaps in his treatment history. Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must first explore the claimant's reasons for the lack of medical care before drawing a negative inference. S.S.R. 96-7p, 1996 WL 374186, at *7; *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir.2009); *Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir.2008). An ALJ may need to " question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner." S.S.R. 96-7p, 1996 WL 374186, at *7. The claimant's " good reasons" may include an inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects. Id. at *8. Here, the ALJ made no effort to question Shauger about the perceived gaps in his treatment history between 1988 and 2009." *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012).

The ALJ also appears to draw a negative inference from the lack of a treating physician's opinion without noting why there was no treating source statement in the record. She notes, "As to the claimant's functional limitations, the record establishes none that are inconsistent with this decision. In fact, the record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision." (R. at 23). Dr. McLaren was the only treating physician at the time of the alleged onset date forward that the plaintiff saw on a somewhat regular basis. Dr. McLaren's failure to render an opinion is contained at R. at 443 whereby it is indicated, "Dr McLaren does not do functional capacity evaluation examinations. These evaluations are generally done through occupational health." R. 443. This does not state that Dr.

18

McLaren does not believe the claimant do be disabled or that she doesn't have limitations, but rather he does not do functional capacity evaluations.  The ALJ erroneously drew negative inferences from the lack of a treating source statement as to the plaintiff's RFC.

The ALJ  also discredits the claimant for the reason she stopped working—noting that she told examiner one thing and testified to another; "At the hearing, the claimant said she stopped working following a TIA accident. However, during her psychological evaluation, she reported that she lost her job because of a "buy out" (Ex. 4F at 5). This evidence also weighs against the claimant's credibility." (R. 23).  This is patently wrong. The claimant testified that she lost her job at Kroger which she worked from 2008-2011 (R. at 37) following a TIA, when asked what happened to the job at Kroger, she testified "At Kroger, on the 13th of May I experienced a TIA and I was unable to go back." (R. 76).   This is substantiated through the receipt of short term disability insurance through her employer (R. 246, 222-226) (which she would not receive in the event of a layoff) and the evidence of her approval for FMLA (R. at 301-302).  As for the buyout, the claimant did testify that she lost a job due to a buyout, the job at Baker Hill discussed at R. 79.   The claimant did tell the consulting examiner that she had been persistently depressed over the past four to give years and that "I lost a very good job at that time because of a buyout. I lost a very good paying job." R at 393.  *The claimant did not tell the consulting examiner that she lost her Kroger job due to the buyout*, and did not specify to which job she was referring.  In fact, the loss of the good paying Baker Hill job would be substantiated at R. at 218 which shows the claimant made over $35,000 in 2006 at Baker Hill, over $36,000 in 2007 and then provided to make only 2683 at Kroger in 2008 and slightly over $21,000 at Kroger in 2009.   The testimony of the claimant is not inconsistent with the record and her credibility should be deemed diminished by the ALJ who clearly failed to accurately read the record.  The ALJ's credibility determination upon which the ALJ relied are patently wrong and as such the ALJ's decision is not supported by the record as a whole, and the decision must be remanded.

19

## VI. THE ALJ ABUSED HER DISCRETION AT STEP TWO OF THE SEQUENTIAL EVALUATION PROCESS BY FINDING THAT THE PLAINTIFF'S ANXIETY AND DEPRESSION WERE NON-SEVERE IMPAIRMENTS

The ALJ opines, "There is no persuasive evidence in the record to establish that these impairments or any symptoms arising thereof continuously cause significant limitations. Thus, while the claimant has been diagnosed with these impairments in the past, I find that they do not affect the claimant's ability to perform basic work-related functions, and are therefore considered nonsevere." (R. 17-18).

The consulting examiner's assessment procedure consisted of Diagnostic Interview, Mental Status examination, Review of Records, and Wechsler Memory Scale – IV (R. 390). With respect to reliability, Dr. London, EdD, Psycholoist HSPP states, "Reliability Statement: I believe Ms. Goddard put forth a good faith effort to meet the demands of the testing situation. I believe *WMS-N* results are valid. Moreover, I believe the claimant attempted to be truthful during the clinical interview. I believe a good assessment of this claimant's present functioning was obtained." (R. 391). Dr. London diagnoses the claimant as having Major Depressive Disorder, recurrent, moderate severity 296.32 and Anxiety Disorder –NOS 300.00. (R. 398). The claimant is found to have a GAF of 55 (R. 398). The claimant has a long history of depression and has been on antidepressants for the majority of the treatment record with Cymbalta noted at R. 456, 460, 565, 596, 597, 605, 689. Her first prescription for Lexapro was October 5, 2004 (R. 516) and her Cymbalta was increased 220 mg on August 26, 2011 (R. 446). The claimant has had a long-standing history of depression which has caused more than a minimal impact her ability to perform activities of daily living and basic work activities. The ALJ states no evidence to the contrary. The ALJ has abused her discretion in failing to find the claimant's anxiety and depression to be severe impairments in light of the history of treatment for depression and the findings of Dr. London who found that "I believe a good assessment of this claimant's present functioning was obtained." (R. 391).

## VII. THE ALJ FAILS TO FOLLOW THE EVALUATION OF FIBROMYALGIA AS SET FORTH BY SSR 12-2P

20

While the ALJ mentions "particular attention was focused on Social Security Ruling 12-2p, which provides guidance on the development and evaluation of fibromylalgia," the ALJ provides no articulation of this alleged attention given.

Again the ALJ fails to set forth the minimum standard of articulation which permits meaningful review of her decision; In *Burnett* it is noted,

> "we stated 'A written evaluation of every piece of testimony and submitted evidence is not required; however, the administrative law judge must articulate at some minimum level his analysis of the evidence in cases in which considerable evidence is presented to counter the agency's position [in order to facilitate and ensure meaningful appellate review]' (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984)). See also *Look v. Heckler*, 775 F.2d 192, 195 (7th Cir.1985); *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985); *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985); *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir.1985)." *Burnett v. Bowen*, 830 F.2d 731, 735 (7th Cir. 1987).

The claimant reasserts her analysis of fibromyalgia under SSR 12-2p at R. at 308-314 including those restrictions caused by the claimant's fibromyalgia.  Failure of the ALJ to articulate her reasoning requires remand.

## V. CONCLUSION

The ALJ's decision contained errors of law and not supported by the substantial evidence of the record.  She fails to articulate the reasons for her findings and as such, the decision should be remanded.

Respectfully submitted this 30th day of March, 2015.

_/s/ Jennifer M. Hess_____
Jennifer M. Hess, Counsel for the Plaintiff (#24227-49)
HESS & HESS
2000 E. 116th Street, Suite 106
Carmel, IN 46032
Telephone:      (317) 844-1377
Fax:             (317) 844-1408
Email:  JenHessAtty@aol.com

21

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on March 30, 2015, a copy of the foregoing Plaintiff's Brief in Support of Judicial Review was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's CM/ECF system.  Parties may access this filing through the Court's system.

Mr. Thomas E. Kieper, Esq.
UNITED STATES DISTRICT ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

                                    /s/ Jennifer M. Hess
                              Jennifer M. Hess, Counsel for the Plaintiff

Jennifer M. Hess, Counsel for the Plaintiff (#24227-49)
HESS & HESS
2000 E. 116th Street, Suite 106
Carmel, IN 46032
Telephone:     (317) 844-1377
Fax:            (317) 844-1408
Email:  JenHessAtty@aol.com
             Jen.Hess@HessAndHessLaw.com